GRIFFIN v. REILLY et al.   (No. 2478.)

(Court of Civil Appeals of Texas.   Amarillo.
April 29, 1925.   Rehearing Denied
June 17, 1925.)

1. Mines and minerals ⊜48—Oil in place in ground is realty, severable from remainder of land by contract or conveyance.

Oil in place in ground is realty, severable from remainder of land by contract or conveyance.

2. Partition ⊜3—Adult heirs of decedent may partition all or part of estate, without aid of judicial decree.

Adult heirs of decedent may partition all or part of estate, without aid of judicial decree.

3. Mines and minerals ⊜55(2)—Deed conveying surface tract and reserving mineral rights in subsurface could not divest mineral interests of persons not parties to deed.

Deed conveying surface tract, and reserving to grantors all oil, gas, and mineral rights in subsurface, could not divest interests in such mineral rights, of persons not parties to deed.

4. Mines and minerals ⊜55(8)—Trial court's cancellation for fraud of quitclaim deed of minerals in subsurface, as not being part of partition contract giving rise to execution of quitclaim deed, held proper.

Cancellation, for fraud, of quitclaim deed to minerals in subsurface, executed on same date parties exchanged deeds pertaining to surface of the land, pursuant to a partition contract relating to surface, *held* proper, as against contention that entire contract cannot be canceled in part, the quitclaim deed not being part of partition contract.

5. Joint adventures ⊜1—Relation of joint adventurers may be created with reference to property already owned by one of members; "joint adventure."

It is not necessary for the relation of joint adventurers to exist before the property with which the members are to operate is purchased, but the relation may be created with reference to property already owned by one member, and in which the other obtains an interest, with intention of selling or using the same for profit; a joint adventure being a special combination of two or more persons, where, in some specific adventure, a profit is jointly sought, without any actual partnership or corporate designation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Joint Adventure.]

6. Joint adventures ⊜4(1)—Each member in joint adventure may demand from associates utmost good faith in all endeavors relating to common interests of association.

Each member in joint adventure may demand from associates utmost good faith in all endeavors relating to common interests of association.

7. Joint adventures ⊜4(1)—Members stand in fiduciary relation, within scope of enterprise, each to other, and are bound by same standards of conduct required between partners.

Members stand in fiduciary relation, within scope of enterprise, each to other, and are bound by same standards of conduct required between partners.

8. Joint adventures ⊜4(1)—When obligation of joint adventure to member begins, applies, and continues stated.

The obligation of a member of a joint adventure to exercise utmost good faith in all endeavors relating to the common interests of the associates begins with the opening of negotiations for the formation of the syndicate, and applies to every phase of the business undertaken, and continues until the enterprise has been completely wound up and liquidated.

9. Joint adventures ⊜4(1)—Member, in promoting or carrying on common enterprise, may not lawfully obtain for himself any secret profit or advantage therefrom.

Member, in promoting or carrying on common enterprise, may not lawfully obtain for himself any secret profit or advantage therefrom.

10. Joint adventures ⊜4(1)—Member cannot, without consent of associates, engage in any individual operations harmful to business engaged in.

Member cannot, without consent of associates, engage in any individual operations harmful to business in which he and associates are engaged in joint adventure.

11. Joint adventures ⊜4(1)—Member cannot acquire interest in property employed in adventure antagonistic to interest which associates have in it.

Member cannot acquire interest in property employed in the adventure antagonistic to interest which associates have in it.

12. Joint adventures ⊜5(2)—Evidence held to support finding that certain lands were part of property of joint adventure.

Evidence *held* to support finding that certain lands were part of property of joint adventure.

13. Trial ⊜350(4)—Refusal to submit issue as to amount of mutual mistake, made in arriving at amount shown in note and deed of trust, held reversible error.

In suit to cancel quitclaim deed, in which defendant sought foreclosure of deed of trust lien, refusal to submit issue as to amount of mutual mistake, made in arriving at amount shown in note to secure which deed of trust was given *held* reversible error.

---

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**14. Parties** ⬡⇒86 — **Sustaining or overruling plea of misjoinder held largely within trial court's discretion.**

Sustaining or overruling plea of misjoinder, which was filed after answer, pleading estoppel and setting up cross-action seeking affirmative relief, *held* largely within trial court's discretion.

**15. Appeal and error** ⬡⇒1036(2) —**Overruling plea of misjoinder of coplaintiff held not reversible error, in absence of showing of injury from ruling.**

Overruling plea of misjoinder of coplaintiff . *held* not reversible error, in absence of showing of injury from ruling.

**16. Appeal and error** ⬡⇒901—**Duty of parties to suit, and not of appellate court, to go into matters requiring calculation of interest upon items as to which error is claimed.**

It is not within province of appellate court to enter into matters requiring calculation of interest upon numerous items in various .amounts, as to which error is claimed, and to go to the record to ascertain the different rates of interest to which either party may be entitled, such duty resting upon the parties to the suit.

**17. Appeal and error** ⬡⇒758(1)—**Brief, failing to specify errors in calculating interest, by making necessary references and calculations required, is to that extent not compliance with briefing rules.**

Brief, failing to specify errors in calculating interest, by making necessary references and calculations required, is to that extent not compliance with briefing rules.

**18. Bills and notes** ⬡⇒129(2)—**Holder of note with optional acceleration clause cannot declare whole amount due without presentment for payment, in absence of expression in note of specific place of payment.**

Where the acceleration clause in a promissory note leaves it optional with the holder to declare the whole amount due· upon failure to pay any installment of principal or interest, the holder cannot, without presentment for payment, exercise his option to declare the whole amount due, if no specific place of payment is expressed in the note until it has been presented to the payor at the latter's known place of business.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Suit by Hugh Reilly, Sr., and others, against H. J. Bruce and H. S. Griffin, who filed a cross-bill. The suit was subsequently dismissed as to first-named defendant, and, pending the suit, plaintiff Hugh Reilly, Jr., was killed, and his widow, Mary Reilly, succeeded him as party in interest. From the judgment rendered, defendant Griffin appeals. Reversed and remanded.

Carrigan, Montgomery, Britain, Morgan & .King and Weeks, Morrow,· Francis & Hankerson, all of Wichita Falls, for appellant.

Kay, Akin & Kenley, of Wichita Falls, and Thomas, Frank, Milam & Touchstone, of Dallas, for appellees.

HALL, C. J. This suit was instituted by Hugh Reilly, Sr., Hugh Reilly, Jr., and Ed Reilly, against H. S. Griffin and H. J. Bruce, to cancel a certain note in the sum of $36,-321, executed by Hugh Reilly, Jr., and Ed Reilly, payable to the defendant, Griffin, and to have a partition and ·accounting. Said note was secured by a deed of trust upon 3,012 acres of land situated in Archer county. Bruce was the trustee in the deed of trust, and was made a party because of the fact that he had advertised the property for sale under the· deed of trust. Hugh Reilly, Jr., was killed after the institution of the suit, and his widow, Mary Reilly, who qualified as community survivor, has succeeded him as a party in interest. The plaintiffs originally prayed for an injunction restraining the sale of the land, but subsequently, the defendant, Griffin, having waived his right to foreclose the deed of trust lien by sale, the suit was dismissed as to the trustee, Bruce.

The case was tried upon the plaintiff's fourth amended original petition, and the defendant's second amended original answer and cross-bill, besides supplemental pleadings. The pleadings in the case are voluminous, and, for the sake of brevity, only such issues as are presented on this appeal are stated, in substance, as follows:

Plaintiffs sought to apply a credit in the sum of $1,100, which Griffin had collected as rent from the land as a payment upon 'the note. The amount of the credit claimed is not disputed. The issue is, whether it should be applied to the principal or the interest of the note. They further prayed for the cancellation and rescission of their quitclaim deed, dated December 9, 1922, conveying certain mineral interests in part of the land in question," which deed, it is asserted, was procured by Griffin by fraudulent representations. They further sought the reformation of the note and deed of trust.

By his answer and cross-action the defendant Griffin asked for a judgment for the amount of his note, principal, interest, and attorney's fees, and a foreclosure of the deed of trust lien.

The case was submitted to a jury upon numerous special issues, many of which ·are foreign to the contentions ˙here presented, and they will not be set out in full. Judgment was entered that the note be reformed and reduced to the sum of $30,397.84 principal, and $1,379.53 interest, decreeing that said interest be tendered into the registry of the court, together with $600 taxes which the defendant, Griffin, had paid upon the lands for the years 1922 and 1923. The judg-

ment further canceled the quitclaim deed executed by Hugh Reilly, Jr., and Edward Reilly to Griffin, by which the grantors released all their right, title, and interest in and to one-tenth of the mineral rights in what is called the Griffin lands. Other matters are disposed of by the judgment which are not involved in this appeal.

It is first insisted by the appellant, Griffin, that because there was a general partition between the plaintiffs and appellant, and as a part thereof plaintiffs had given him a quitclaim deed to a one-tenth mineral interest in the Griffin lands, and it further appearing that plaintiffs were seeking to affirm a part of such partition and at the same time to disaffirm the quitclaim deed, the court erred in canceling the deed because there could be no partial cancellation or rescission of an entire transaction. In this connection, it is further insisted that, because the undisputed evidence shows that Griffin, at the time he executed the conveyance to Hugh Reilly, Sr., did not own any mineral interest in the Griffin lands, the court erred in canceling the conveyance upon the theory that he had falsely represented to the Reillys that he had no such mineral interest.

The lands in question belonged to E. E. Griffin, the father of the appellant, H. S. Griffin. By will, the father devised his land to his four sons and his wife, Sadie P. Griffin, and under its terms each of the devisees inherited an undivided one-fifth in the entire estate. This land was partitioned by a decree of the district court in Hill county. Prior to that time it became known that the lands in Archer county would probably yield minerals upon development, and it was agreed amongst the devisees that they would not partition the mineral rights in these lands, and the preliminary judgment so decreed. In accordance with this agreement, the commissioners in partition made no reference to the reservation of mineral rights, and the effect of the final judgment, which must be construed in connection with the mutual understanding of the parties to it, did not dispose of the subsurface estate. In partitioning the surface estate the wife and Ned C. Griffin, one of the sons, took the lands in question, which they afterwards sold to the appellant herein. The conveyance from Ned C. Griffin and the wife of E. E. Griffin (who since the death of her husband had married Ned C. Griffin) reserved all minerals in the grantors. This reservation must, of course, be limited by the extent of the interest which they really had under the will of E. E. Griffin, and in accordance with the partition agreement in Hill county. This, as stated, was a one-fifth interest each. After acquiring the interest of Ned C. and Sadie P. Griffin, H. S. Griffin sold to Hugh Reilly, Sr., an undivided one-half interest in these tracts, and, in addition, specifically conveyed to him an undivided one-tenth interest in and to the oil and gas which might underlie the surface estate. The other two sons of E. E. Griffin, deceased, received, as their share of their father's estate, lands situated elsewhere than in Archer county, and at the time of these transactions, in virtue of the agreement between them, all parties owned each an undivided one-fifth interest in the subsurface or mineral estate in the Archer county lands. That this was the intent of all the parties is clear from subsequent events showing their practical construction of the Hill county decree. July 9, 1918, and July 13, 1918, the executor of the will of E. E. Griffin leased part of the lands in question to H. S. Griffin, and in the partition agreement of May 8, 1920, all the devisees acknowledged the validity of these leases. This is a significant fact, in the light of the record showing that under the partition agreement in Hill county it was provided that the administrator of E. E. Griffin, deceased, should still hold for administration the mineral estate. The partition agreement which forms the basis of the decrees of partition in Hill county is dated November 19, 1915, and after setting apart specific property not involved here to Sadie P. Griffin, it recites:

"It is further understood and agreed that the remainder of the estate is to be divided into five equal parts, one part to be set aside to Sadie P. Griffin, widow, and one part to each of the four sons of E. E. Griffin."

Continuing, said instrument further recites:

"It is further understood and agreed that all oil rights and oil interests shall be and remain equal in each of the four sons of E. E. Griffin, and his surviving wife, Sadie P. Griffin, that is, the oil rights are not to be affected by this partition."

[1, 2] These recitals explain the failure of the final decree in Hill county to make any disposition whatever of the oil rights. It is settled law in this state that oil in place in the ground is real estate, and may be severed from the remainder of the land by contract or conveyance. Hogg v. Magnolia Petroleum Co. et al. (Tex. Com. App.) 267 S. W. 482. The adult heirs of a decedent have the unquestioned right to partition all or any part of the estate, without the aid of a judicial decree, and when the Hill county partition agreement recited that the administrator should retain in his possession, and under his control, all property not specifically apportioned in the agreement because it was not deemed advisable to withdraw the same from his administration, and expressly reserved as property to be retained by him, "the oil and mineral rights in the several tracts which are described in the pleadings, save and except that which is heretofore set aside to Sadie P. Griffin, etc.," they excluded from partition the mineral estate."

[3] We think it is conclusive that at the time appellant conveyed an undivided one-half interest in the lands in question, and a one-tenth interest in the mineral rights to Hugh Reilly, Sr., each of the heirs of E. E. Griffin were the owners of an undivided one-fifth interest in the subsurface estate of the Archer county lands. This being true, Ned C. Griffin and Sadie P. Griffin could not, by any recital in their deed to appellant, affect these several interests, and, although their deed to appellant recites that, "all oil, gas, minerals in, on and under the above described property are hereby reserved in grantors," this reservation must be limited to refer only to the one-fifth interest which each owned, and can in no wise be extended to reserve to them and vest title in them to the three-fifths interest owned by appellant and the other two sons of E. E. Griffin, deceased. The Hill county partition agreement of May 8, 1920, also contains this recital:

"Whereas, the undersigned, Ned C. Griffin, Sadie P. Griffin, James H. Griffin, Phillip C. Griffin, and Herbert S. Griffin are the surviving heirs and devisees under the will of E. E. Griffin, deceased, and as such are the equal and joint owners of all the oil, gas, mines, and minerals, of whatever name, nature or character lying in or under the lands and hereditaments hereinafter described," etc.

This mutual acknowledgment of joint ownership was never thereafter by common consent modified in any degree. After appellant had acquired the title to the lands involved in this suit, he sold and conveyed to Hugh Reilly, Sr., a one-half undivided interest in them, and as stated above, in the same conveyance vested a one-tenth interest in and to the subsurface estate. This conveyance was predicated upon the fact that appellant owned an undivided one-fifth interest in the mineral rights. The record shows that he was correct in his assumption. This conveyance to Hugh Reilly, Sr., is dated the 14th day of September, 1918. Later, on December 20, 1921, Hugh Reilly, Sr., conveyed to his sons, coplaintiffs herein, Hugh Reilly, Jr., and Ed Reilly, the same property described in the deed of September 14, 1920. As part of the consideration for such conveyance, the grantees, Ed and Hugh, Jr., assumed the payment of notes which Hugh Reilly, Sr., had executed for these lands and certain other lands, known as the Traweek lands and Rogers lands. As we gather from the record, the consideration for the note in suit represents the indebtedness of Hugh Reilly, Sr., to H. S. Griffin for all of said property, which was subsequently merged in said note. After the transfer by Hugh Reilly, Sr., to his two sons of his interest in the property, and the assumption by them of all indebtedness to appellant on November 24, 1922, a partition agreement was entered into between appellant and the two Reilly sons. The purpose of this agreement, as appears from its face, was to divide the lands which they owned jointly between the three owners, and it contains this recital:

"It is understood that some of the grantors of the parties of the first part (appellant) and remote grantors of the parties of the second part (Ed and Hugh Reilly, Jr.) have retained mineral rights in some of the lands to be partitioned, as above stated, but it is distinctly understood, and shall be expressed in said conveyances, that the parties hereto will retain the mineral rights in all the above described lands in the proportion and in the manner now held by them, and the mineral rights under said land shall not be divided."

The parties referred to as "some of the grantors," and "remote grantors," are necessarily Ned C. and Sadie P. Griffin, and, as shown above, the only rights which they could have retained were their individual one-fifth interests. Since there had been no partition amongst the original heirs of E. E. Griffin, the parties to the instrument now under discussion could not, as between themselves, specifically divide the subsurface estate which they owned in common. Therefore they expressly stipulate that the mineral rights under said land shall not be divided. This retention by each party of his full undivided mineral interest is a part of the mutual consideration for the agreement. It appears that 15 days afterwards, appellant and the Reillys met for the purpose of consummating this agreement by executing partition deeds of the lands therein described. At this time Griffin informed the Reillys that he did not own any mineral rights under some of the lands, and while he did not specify the particular lands, it is clear that he referred to the property which he had acquired from Ned C. and Sadie P. Griffin, and which are designated in the record as the Griffin lands. We cannot presume that he referred to either the Rogers or the Traweek lands. At this time certain property was set apart to the Reillys, and part of the remainder conveyed by them to appellant.

[4] On the same day, and, it is urged, as a part of the same transaction, the Reillys, relying upon the statement that appellant did not own any mineral interest in the Griffin estate lands, conveyed to him by quitclaim deed all mineral rights in said property. No consideration whatever moved from appellant to the Reillys for such conveyance, and its execution was not a part of the things to be done under their partition agreement entered into 15 days prior thereto. The quitclaim deed is no part of, nor is it connected with, the partition proceedings; on the contrary, it relates to the subsurface estate which was expressly excluded by the above quoted paragraph from the partition agreement. Therefore the rule which forbids the cancellation and rescission, in part, of an entire contract has no application. While the

quitclaim deed was executed on the same day, the trial judge correctly held that it was no part of the partition contract, and, since it was obtained by fraudulent representations, the action of the court in cancelling it must be sustained.

[5] The appellant's next contention is that the court erred in defining joint enterprise, and in refusing to give the appellant's special charge, which it is contended clearly defined the relation between the parties. This definition of the term of joint enterprise was requested by the jury in connection with the special issues Nos. 4 and 5, inquiring whether appellant bought the Rogers land and the Traweek land as a joint enterprise of appellant and Hugh Reilly, Sr. We presume that the court intended to define joint adventure. It is held by the Commission of Appeals in Connellee v. Nees, 266 S. W. 502, that the term "joint enterprise" is not a legal term, and has no definite legal meaning, but the pleadings and evidence in this case are sufficient to show that the relation which existed between appellant and Hugh Reilly, Sr., is that of joint adventurers, and since it is further clearly shown that, after the sale by Reilly, Sr., of his interest in the joint adventure to his sons, they were recognized by appellant as the rightful and lawful successors in the enterprise, we think the relation between appellant and Reilly's sons was the same as existed while their father was the joint owner of the property. 33 C. J. 850, § 30. A joint adventure is defined to be a special combination of two or more persons, where in some specific venture a profit is jointly sought, without any actual partnership or corporate designation. 33 C. J. 841. The contention of appellant under this proposition is that the definition given by the court, as follows: "A joint enterprise is one in which two or more different parties are jointly interested, whether their respective interests are the same or not. It must be based upon the mutual agreement of such parties to be thus interested"—is insufficient and incorrect, for the reason that before there could be a joint enterprise, it must appear that at the time of the purchase of the land, Reilly, Sr., had previously bound himself to purchase the same, together with Griffin. As we understand the relation of joint adventurers, it is not necessary for the relation to exist before the property with which the partes are to operate is purchased, but that the relation may be created with reference to property already owned by one of them, and in which the other obtains an interest with the intention of selling or using the same for profit. The court therefore did not err in refusing the special charge requested by appellant defining the joint enterprise.

[6-11] The jury found that the Griffin lands were not purchased in pursuance of the joint adventure, but that the Rogers and Traweek tracts were purchased as a joint adventure. It is true that the jury found that the settlement between appellant and Reilly's sons, as evidenced by the instruments dated December 9, 1922, and June 21, 1922, was made while the parties were dealing with each other at arm's length. The court further defined the term, "dealing at arm's length," as meaning that each party was looking after his own business interest, and using his own judgment in the matter, and not relying upon the adverse party to take care of his interest in the transaction. This finding conflicts with the findings relating to the Rogers and Traweek lands—that they had been purchased as a joint enterprise. The relation of the parties was not terminated by the execution of the deeds and the note referred to above. They still jointly owned an interest in the Dundee townsite, and there was no partition of the mineral estate in the lands. The pleading and the evidence shows that Reilly, Sr., resided in New Mexico, and that appellant was the active manager of the property and business of the adventure. The partial settlement itself contemplated the further management and control of the undivided interest by appellant, and the rule is, that:

"Where persons engage in a common enterprise by way of joint adventure, each has a right to demand and expect from his associates the utmost good faith in all that relates to their common interests. Within the scope of the enterprise, they stand in a fiduciary relation, each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, and applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and liquidated. No member, in promoting or carrying on the common enterprise can lawfully obtain for himself any secret profit or advantage therefrom, nor can he, without the consent of his associates, engage in any individual operations, harmful to the business in which he and his associates are engaged, or acquire any interest in the property employed in the venture antagonistic to the interest which they have in it." 33 C. J. 851, 852, § 36.

[12] Our conclusion is that the finding of the jury, to the effect that the Traweek and Rogers lands were a part of the property of the joint adventure, is fully supported by the evidence, and the same finding with reference to the Griffin lands, if returned by the jury, would have also been supported by the evidence.

[13] The first special issue submitted to the jury inquired whether there was a mutual mistake made in the amount shown in the note and deed of trust executed by Reilly's sons to appellant on December 9, 1922, aside from the mistakes which appellant admitted. The appellant requested the court to have the jury answer as to the amount of the mistake,

which was refused, and this action of the court, it is insisted, is error. We think this proposition is sound. In passing on this contention, we are forced to rely almost entirely upon the appellant's brief. The appellees' brief contains no subject index, nor list of authorities, as is required by rule 35; and the references to the record are not sufficient to enable us to understand fully the appellees' contentions under the remaining propositions.

With reference to the special issues under consideration, it seems that appellant admitted a mistake of $30 and a mistake of $677 in his favor, in the execution of the note for $27,141.20, which subsequently became the basis for calculating the amount due, and which resulted in the execution of the note for $36,321 here sued upon. The jury found that there was a mutual mistake, and appellant requested that the court have the jury to "state whether or not plaintiffs, Hugh Reilly, Jr., and Edward Reilly, on or before June 21, 1922, mutually agreed with each other to settle all claims each might have against the other, and then and there agreed that said Hugh Reilly, Jr., and Edward Reilly were due H. S. Griffin the sum of $27,141.20 upon the payment by defendant, Griffin, of two vendor's lien notes for $4,614.00 each, due Ned C. and Sadie P. Griffin." The court refused to submit this, because, as noted upon the request, "it was not a controverted issue." The evidence shows that the note for $36,321 is the result of adding $9,150 and some interest to the original note of $27,141.20, but the correctness of the items going to make up the $9,150 and the interest were sharply contested issues.

There was an issue as to the liability of appellant for rents and revenues due appellees, and for which the jury found appellant had not duly accounted. This item may possibly have been eliminated by admissions in open court, but there still remained the interest on certain indebtedness still due the original vendors of the Rogers and Traweek lands, and the application of payments made by Reilly, Sr., to appellant in connection with these purchases. The amount of interest due would be affected to some extent by the proper application of $1,100 rental collected by appellant either to principal or interest. A part of the lands for which the $36,321 note, secured by the deed of trust, upon which appellant is seeking to foreclose, was given, is described as the Griffin estate lands, consisting of approximately 4,230 acres. This land had been purchased by appellant from Ned C. and Sadie P. Griffin July 11, 1918, a one-half interest in which had been transferred by appellant to Reilly, Sr., on September 14, 1918. The conveyance to appellant from Ned C. and Sadie P. Griffin recites a cash consideration of $15,000 and the execution by appellant of five promissory notes for $4,614 each, bearing 3 per cent. interest. Included in the deed of trust was what is known as

the Traweek 554 acres. The consideration recited in the deed to appellant is $12,500, $2,500 of which it is stated was paid in cash, the remainder of the consideration being the assumption by the grantees, appellant and Reilly, Sr., of a note for $2,000 and interest thereon, and the further execution and delivery to Mrs. Traweek of seven notes for $1,125 each. A one-half interest in this land was conveyed to Reilly, Sr., by appellant September 12, 1918. The deed recited a consideration of $1,250 cash, and the assumption by Reilly, Sr., of one-half of the amount due on the above-described notes, totaling $5,000. On June 27, 1918, appellant purchased for himself and Reilly, Sr., 477 acres, described as the Rogers land, paying therefor $1,000, and, as further consideration, assuming a note of $3,750 which Rogers had executed to W. T. Seibold November 15, 1916, and the further assumption of nine interest notes due from Reilly to Cowper in the sum of $56.25 each. The deed from appellant to Reilly, Sr., conveying a one-half interest in this land, recites a cash consideration of $1,000, and the assumption by Reilly of one-half of the notes above described, including the note for .$8,-000.00.

It was further contended that, although the deeds from appellant to Reilly, Sr., recited a total consideration of $9,750, viz., $7,-500 for the Griffin land, $1,250 for the Traweek land, and $1,000 for the Reilly land, yet said Reilly, in fact, had paid appellant $7,500 at one time, $4,500 at another, and $10,152 at another, aggregating $20,152, or in other words, that he had paid $14,652 in cash, the receipt of which was nowhere acknowledged in 'any of the deeds from Griffin to Reilly. It was alleged that the failure of the deeds to recite the several amounts as paid was due, in part, to the fraud of Griffin in not informing the attorneys who prepared the deeds of the facts with reference to the payments and the amounts thereof.

Other matters were in dispute, a consideration of which had to do with the amount of the note made by the Reillys in the settlement in question, but the above facts are sufficient to show that the court should have submitted to the jury issue or issues, answers to which would have shown the amounts concerning which the parties were mutually mistaken.

[14, 15] The appellant complains of the court's action in overruling his plea of misjoinder of Reilly, Sr., as a party plaintiff. This plea was not filed until after the original answer had been filed, and after appellant had, by a cross-action and plea of estoppel against Reilly, Sr., asked for affirmative relief. The plea of abatement appeared by way of a special exception, filed on the day of the trial, and by a supplemental motion to dismiss, filed the same day. The proposition raises a question which is largely within the discretion of the trial court, and appellant fails to show that he was injured by the rul-

ing of the court. He took no bill of exception upon the ground that Reilly, Sr., was permitted to remain in the courtroom during the trial, instead of being excluded under the rule which we may infer was asked as to other witnesses. Since Reilly, Sr., had conveyed his interest in the mineral estate in the Griffin lands to the appellees, his sons, by warranty deed, it is possible that the court would have erred in sustaining the plea in abatement upon the ground of misjoinder.

[16, 17] The ninth, tenth, and eleventh propositions are to the effect that the court having failed to submit to the jury in what particulars the parties were mutually mistaken when the note was executed, and having undertaken to calculate the interest due either party with reference to the numerous transactions which entered into the settlement, has calculated the interest at a rate not authorized by the proof, and upon items which should not have been charged to appellant. Because of the want of the proper reference to the record in appellees' brief, we must consider these contentions from the appellant's standpoint, and without discussing in detail the numerous facts set out in appellant's brief, we think it is clear that the judgment is excessive in a sum approximating $2,000. Appellate courts are not called upon, nor is it within their province, to enter into such matters, requiring the calculation of interest upon numerous items of various amounts, and to go to the record to ascertain the different rates of interest to which either party may be entitled. That duty rests upon the parties to the suit, and a brief which fails to specify the errors, by making the necessary references, the calculations required, is, to that extent, a noncompliance with the rules of briefing. As far as we are able to ascertain, from an inspection of appellant's brief, the court erred in calculating the interest on the several amounts which appellant had paid at 6 per cent., instead of at the rate of interest provided in the several notes paid by appellant.

[18] The note sued upon was payable at Dundee, Tex. It was not presented to either of the payors at that place, or elsewhere, on the date of its maturity. The record shows that both parties resided at Dundee. The note was not made payable at any bank or other specific place in Dundee. The appellant insists that it was the duty of appellees to tender him the interest, and, on the other hand, appellees insist that it was the duty of appellant to present the note to the bank where both of them were customers, or to them in person, and because this was not done at maturity, the acceleration clause did not apply. Where the acceleration clause in a promissory note leaves it optional with the holder whether he shall declare the whole amount due upon failure to pay any install-

ment of principal or interest, such holder cannot, without presentment for payment, exercise his option to declare the whole amount due, if no specific place of payment is expressed in the note, until it has been presented to the payor at the latter's known place of business. Bardsley v. Washington Mill Co., 54 Wash. 553, 103 P. 822, 132 Am. St. Rep. 1133; Beckham v. Scott (Tex. Civ. App.) 142 S. W. 80.

The judgment is reversed, and the cause remanded.